UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
JUSTIN ZAMANI,                                      :
                                                    :
                            Plaintiff,              :        **REPORT AND**
                                                    :        **RECOMMENDATION**
                      -against-                     :
                                                    :        14-CV-5605 (MKB)(PK)
NASSAU COUNTY and NASSAU COUNTY                     :
SHERIFF'S DEPARTMENT,                               :
                                                    :
                            Defendants.             :
                                                    :
-------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

      *Pro se* Plaintiff Justin Zamani ("Plaintiff") brings this civil rights action against Defendants

Nassau County and Nassau County Sheriff's Department (collectively, "Defendants") pursuant to

42 U.S.C. § 1983.[1]  (Compl. at 4, Dkt. 1.)  Plaintiff alleges that, during his incarceration in the Nassau

County Correctional Center ("NCCC"), he was denied nightly congregate Ramadan worship in

violation of his First Amendment right to free exercise of religion.  (*Id.*)  Additionally, he alleges that

the evening meals provided to Muslim inmates during the period of Ramadan often consisted of

spoiled food.  (*Id.*)

      Before this Court on referral from the Honorable Margo K. Brodie is Defendants' Motion

for Summary Judgment ("Motion").  (Mot. for Summary Judgment ("Motion"), Dkt. 59; March 8,

2019 Order.)  For the reasons stated herein, the undersigned respectfully recommends that the

Motion be granted in part and denied in part.

---

[1] Although Plaintiff does not cite Section 1983 in his Complaint, the undersigned construes his claims as
arising under such section, which provides a cause of action against "any person who, acting under color of
state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United
States."  42 U.S.C. § 1983.  *See, e.g., Peggs v. Rehor,* 14-CV-1914 (ENV) (MDG), 2014 WL 2465826, at *2
(E.D.N.Y. May 30, 2014) (construing *pro se* complaint as arising under Section 1983).

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Defendants' Rule 56.1 Statement of Undisputed Facts

(Dkt. 59-12) ("Defs. Statement"), Plaintiff's Rule 56.1 Statement (Dkt. 65) ("Pl. Statement"), and

their supporting documents.  All facts are construed in the light most favorable to Plaintiff as is

required when a defendant moves for summary judgment.[2]  *Wells v. McKoy*, 16-CV-00113 (EAW),

2018 WL 6833665, at *1 (W.D.N.Y. Dec. 27, 2018).

Plaintiff is a Muslim inmate at NCCC.  (Pl. Deposition Transcript ("Tr.") at 17, Dkt. 71.)

Ramadan is a Muslim "month long celebration" during which Muslims are required to fast from

sunrise to sunset.  (Defs. Statement ¶ 4; *see also* Golio Decl. ¶ 6, Dkt. 59-9; Tr. at 29.)  In 2014,

Ramadan took place from June 28 to July 28, and during this time, the sun set at approximately 8:30

p.m.  (Defs. Statement ¶ 4; *see also* Golio Decl. ¶ 6, Dkt. 59-9; Tr. at 29.)  Muslim inmates at NCCC

were "not allowed to gather together for the evening meal at which they broke the daily fast" during

Ramadan that year.  (Defs. Statement ¶ 6; Compl. at 4.)  Inmates were permitted to "observe the

daily celebrations and prayers on an individual basis" and "to celebrate in a congregant service for

the Eid al Fitr holiday on July 29, 2014, celebrating the end of Ramadan and the weekly congregant

---

[2] Plaintiff filed a statement pursuant to Local Civil Rule 56, but failed to specifically controvert Defendants' statements with citations to evidence in the record.  (*See* Pl. Rule 56.1 Statement, Dkt. 65.)  "Normally, failure to comply with Local Rule 56.1 permits a reviewing court to consider the facts undisputed for purposes of the motion."  *See* Fed. R. Civ. P. 56(e)(2); Local Civil Rule 56.1(c).  "However, district courts have 'broad discretion' to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001).  Given Plaintiff's status as a *pro se* litigant, "the Court exercises that broad discretion and conducts an 'assiduous review of the record' to determine whether there is any evidentiary basis for his assertions and to determine any other material issues of fact."  *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 581 (S.D.N.Y. 2012) (citations omitted); *see also Geldzahler v. New York Medical College*, 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y. 2010) (reviewing record even though *pro se* litigant did not cite to evidence in Rule 56.1 Statement).

Friday service." (Defs. Statement ¶¶ 11-12; *see also* Golio Decl. ¶¶ 2, 8; Kretzing Decl., Ex. D, Dkt. 59-5.)

Defendants contend that NCCC does not have a central cafeteria or mess hall, so in order to accommodate "congregate religious activities of any type at NCCC, additional security staff must be redeployed from other duties/assignments, or additional off-duty staff has to be hired on an overtime basis." (Defs. Statement ¶¶ 7-8; Golio Decl. ¶ 6.) The decision was made not to permit nightly congregate worship based on this need to redeploy or add resources. Before implementing the policy, Defendants consulted Imam Isa Kareem, NCCC's religious advisor for the Muslim religion, who informed them that daily congregate celebration was not a requirement for the celebration of Ramadan. (Defs. Statement ¶ 10; Golio Decl. ¶ 7.)

For Muslim inmates during Ramadan, evening meals consisted of "1 kosher tray, 1 Styrofoam container with a starch and vegetable, 1 bowl of salad with clear wrap, 2 slices of bread in a sandwich bag, and 1 skim milk held on ice." (Defs. Statement ¶ 14; *see also* Gerrato Decl.¶ 3.) Plaintiff testified at his deposition that each day, the last meal was served at 4:00 or 4:30 p.m. and the food remained without refrigeration or any form of reheating in the inmate's cell until the Muslim inmates broke their fast at 8:30 p.m. or 9:00 p.m. (*See* Pl. Statement ¶ 15; Tr. at 30.) According to Plaintiff, there was no air conditioning in the cell, so not only did the hot food become cold, but the food also spoiled. (Tr. at 34.) In particular, evaporation had built up inside the plastic lid, the meat had become "discolored," and the salad had become "slippery," with brown and dark spots and resembled seaweed or sewage. (Pl. Supplemental Affidavit ¶¶ 42, 43, Dkt. 71; Tr. at 35, 37-38.) This continued "most nights" "for 30 straight ongoing days." (Compl. at 4; Pl. Supplemental Affidavit ¶ 5.) Plaintiff testified, "I didn't eat the food…. I was starving but I couldn't," adding that "most of the days, yeah, I didn't eat anything. Maybe I would eat the vegetables… I couldn't eat anything else." (Tr. at 38.) Plaintiff became hungry, although he did not become sick. (Tr. at 40). As a

3

result, he lost a "substantial amount of weight." (Pl. Statement ¶ 14.) Plaintiff testified that he weighed 220 pounds at the beginning of Ramadan and weighed 160 pounds in November 2014.[3] (Tr. 58).

## II.    Procedural Background

On September 22, 2014, Plaintiff filed the Complaint. On September 29, 2014, the Court granted Plaintiff's Motion for Leave to Proceed *in forma pauperis*. (Sep. 29, 2014 Order.) On December 12, 2014, Defendants filed their answer. (Answ., Dkt. 12.)

On October 3, 2018, Defendants filed the Motion. They argue that Plaintiff's claim based on the denial of nightly congregant worship must be dismissed because the procedures in place during Ramadan 2014 were "borne out of legitimate penological interests." (Defs. Mem. of Law at 7-10, Dkt. 59-13.) Regarding the spoiled food claim, Defendants argue that Plaintiff failed to exhaust administrative remedies. (*Id.* at 10-11.) In the alternative, they argue that, even if the food was spoiled at times, this represented a *de minimis* burden on Plaintiff's free exercise rights. (*Id.* at 11-12.)

On October 25, 2018, Plaintiff filed his "Opposition to Motion for Summary Judgment." (Pl. Response, Dkt. 60.) On November 14, 2018, Defendants filed their Reply. (Defs. Reply, Dkt 62.) Subsequently, Plaintiff filed various supplemental documents, including:

(1) Rule 56.1 Statement and Addendum (Dkts. 65-66);

(2) a document entitled "Response to Defendants' Memorandum of Law in Support of Defendents [sic] Motion for Summary Judgment" (Pl. Second Response, Dkt. 68);

---

[3] Defendants dispute this fact and attach a copy of portions of Plaintiff's medical record, which show that, at the time of admission to NCCC on July 27, 2012, Plaintiff weighed 160 pounds, and on September 8, 2014, his weight was 193 pounds. (White Decl. ¶ 4, Dkt. 73; *see also* Dkt. 75-1.)

(3) a supplemental affidavit from Plaintiff, dated December 27, 2018 (Pl. Supplemental

Affidavit at 3), attaching various exhibits, including (a) a Memorandum of Law "in support of

supplemental affidavit & exhibits" (*id.* at 21-35 ("Pl. Mem. of Law"); (b) a copy of some of the

exhibits filed by Defendants (*id.* at 37-59); (c) a copy of Plaintiff's deposition's transcript (*id.* at 60-

137; and

(4) a letter dated January 10, 2019, providing the Court with "documentary proof of the

religious tenets of Islam." (Dkt. 72.)

On January 30, 2019, Defendants filed supplemental documents in light of Plaintiff's

supplemental filings.  (Dkts. 73, 74, 75.)  Plaintiff filed a sur-reply on February 25, 2019. (Pl. Sur-

Reply, Dkt 81.)  On March 8, 2019, the case was reassigned to Judge Brodie and the undersigned.

(*See* Mar. 8, 2019 Order.)


# DISCUSSION

## I.        Legal Standard for Summary Judgment

Rule 56 provides that a "court shall grant summary judgment if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, a party must show

something more than "*some* alleged factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986) (emphasis in the original).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.  The

nonmoving party must "make a sufficient showing on an essential element of [the nonmoving

party's] case with respect to which [the nonmoving party] has the burden of proof." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986).  Without such a showing, summary judgment will be entered

because there is "no genuine issue as to any material fact….[A] complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (internal quotations omitted).

A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "It is the movant's burden to show that no genuine factual dispute exists…." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). The party opposing summary judgment must set forth evidence demonstrating a genuine issue for trial, and may not rely only on allegations in its pleadings. *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment.").

A court resolving a motion for summary judgment draws all reasonable inferences and resolves all ambiguities in favor of the nonmoving party. *Anderson*, 477 U.S. at 255; *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

*Pro se* complaints should be reviewed carefully, liberally, and be interpreted to "raise the strongest argument it suggests." *Green v. United States*, 260 f.3d 78, 83 (2d Cir. 2001). This is particularly important with allegations of civil rights violations. *See Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir. 2001).


II.    **Analysis**

A.  Claims Against the Nassau County Sherriff's Department

Plaintiff asserts claims against the Nassau County Sheriff's Department and the County of Nassau. Defendants argue that the Nassau County Sherriff's Department is not a suable entity and should be dismissed from this claim. (Defs. Mem. of Law at 2, note 1.)

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be

sued." *Mendoza v. County of Nassau*, 11-CV-02487 (SJF) (AKT), 2012 W L 4490539, at *4 (E.D.N.Y. Sept. 27, 2012) (citation omitted).  Because the Nassau County Sheriff's Department is an administrative arm of Nassau County, it is "well established" that, "without a separate legal identity, the claims against it are redundant to the claims against Nassau County." *Miller v. Cty. of Nassau*, 10-CV-3358 (ADS) (AKT), 2013 WL 1172833, at *4 (E.D.N.Y. Mar. 19, 2013) (collecting cases).

Accordingly, the undersigned recommends that Defendants' Motion be granted as to Nassau County Sheriff's Department.

### B.  Exhaustion of Administrative Remedies

Defendants argue that Plaintiff failed to exhaust his administrative remedies with regard to the claim related to Ramadan food services.  (Defs. Mem. of Law at 11; Defs. Suppl. Mem. at 1, Dkt. 74.)[4]

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  To exhaust a claim, "prisoners must 'complete the administrative review process in accordance with the applicable procedural rules . . . and provide the level of detail necessary in a grievance to comply with the grievance procedures[.]'"  *Tomassi v. Nassau Cty.*, 15-CV-3652, 2019 WL 1440898, at *7 (E.D.N.Y. Mar. 15, 2019), *R&R adopted*, 2019 WL 1440154 (E.D.N.Y. Mar. 29, 2019).  "Thus, the exhaustion inquiry requires that the court look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures."  *Id.* at *7 (quoting *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009))

---

[4] Defendants do not argue that Plaintiff failed to exhaust his administrative remedies with respect to the congregate worship claim.  (Defs. Suppl. Mem. at 1.)

(quotation marks omitted).  The procedural rules to be followed by inmates are "defined not by the PLRA, but by the prison grievance process itself."  *Jones v. Bock*, 549 U.S. 199, 200 (2007).

The NCCC's Grievance Procedure requires that inmates file a grievance within five days of the incident or action.  (*See* Kretzing Decl., Ex. C, Grievance Procedure at 4, Dkt. 59-4.)  Inmates must complete a grievance form and place it in the grievance mailbox.  Staff from the Grievance Unit collects the form and issues a receipt.  If a grievance is deemed "too vague to understand" or "fails to contain supporting evidence or information," it is returned to the inmate and the inmate has two days to supply "sufficient information or evidence."  Failure to do so "shall be cause to deny the grievance."  The Grievance Coordinator issues "written findings" within five days of receipt of the grievance.  Inmates may appeal the decision within 2 business days after receiving the written findings.  (*Id.*)  A final written determination on the appeal is issued by the Chief Administrative Officer within 5 business days.  The inmate may then appeal the Chief Administrative Officer's decision to the N.Y.S. Commission of Correction.  (*Id.* at 6.)

The record shows that Plaintiff attempted to submit four grievances regarding the issue of spoiled Ramadan meals: two grievance forms were submitted on July 11, 2014 (Kretzing Decl., Ex. E at 2-3, Dkt. 59-6); one grievance form was submitted on July 13, 2014 (*id.* at 4); and one grievance form was submitted on July 19, 2014 (*id.* at 5).[5]  The Grievance Coordinator returned the first three grievances to Plaintiff, which were not assigned grievance numbers, asking Plaintiff to "resubmit a new grievance" with more details, including dates of the spoiled food and whether Plaintiff sought medical treatment.  (*Id.* at 2-4.)

---

[5] Plaintiff alleges there were additional related grievances in June.  However, upon the Court's order, on November 20, 2017, Defendants filed a status report letter indicating that, after a review of the paper work, there were no additional grievances from June 2014, but there were <u>unrelated</u> grievances from August 7, 2013, December 2, 2013, and December 26, 2013.  (*See* Dkt 36.)

The grievance form submitted on July 19, 2019, by contrast, was identified as Grievance #

084-07-14.  (*Id.* at 5.)  On the form, Plaintiff wrote,

> The food I get for Ramadan is not only bland, but [illegible].  I receive my meal at 4
> p.m. and I do not eat it until 8:30 which is the time of breaking fast.  EVERY night
> since the first night of Ramadan my food has been either spoiled (salad), cold (main
> dish), both, and/or rotten (milk).  (*Id.*)

In the section requesting documentation or information to support the grievance, he wrote,

> I have presented to fellow officers, such as Cuevas and Ludwig, who have confirmed
> as such.  Especially the milk which I save because it is breakfast which means it has
> sat out for 12 straight hours!  (*Id.*)

On July 24, 2014, the Grievance Coordinator decided that the grievance was a "Non-

Grievable issue," writing on the Grievance Form,

> The grievant claims that he notified staff, but fails to state what happened
> afterwards; did the officers resolve his issue?  Was the grievant escorted to medical?
> When?  This complaint is too vague and doesn't have a date of incident.  The
> grievant is advised to read the Inmate Handbook "Grievance Procedures" before
> filing another grievance.  (White Decl. ¶9, Dkt. 73; Kretzing Decl. Ex. E at 5.)

On the same date, Plaintiff signed the Grievance Form, indicating, "I have read and appeal

the Grievance Coordinator's decision."  (*Id.*)  A notation beneath the Grievance Coordinator's

decision indicates, "Date is listed above.  Food was thrown out.  NO visit to medical."  (*Id.*)  It is

unclear who wrote this in and when.

No procedures are described in the Inmate's Handbook requiring an inmate to take further

action to appeal the Grievance Coordinator's decision to the Chief Administrative Officer, and

Defendants do not contend that the NCCC took any action to carry out Plaintiff's request to appeal

the decision.  Rather, Defendants argue that Plaintiff failed to follow the grievance procedure and

provide supporting evidence or information with respect to his complaints about his food, thereby

failing to exhaust administrative remedies.  (Defs. Suppl. Mem. of Law at 2.)

The undersigned disagrees.

The NCCC's Grievance Procedure provides that a grievance form will be returned to the inmate if it is "too vague to understand or fails to set forth supporting evidence or information." (Kretzing Decl., Ex. C at 5.)  Failure to supply the information constitutes a basis for denying the grievance, and it is then up to the inmate to resubmit the grievance form with the required information within two days.  (*Id.*)  Plaintiff's three Grievance Forms dated July 11, 2014 and July 13, 2014, were returned to Plaintiff on this basis and he did not resubmit them.  (Kretzing Decl., Ex. E.)

With regard to the Grievance Form dated July 19, 2014, however, the Grievance Coordinator checked off the box under "Decision of the Grievance Coordinator," indicating that it was a "Non-Grievable issue."  (White Decl. ¶9; Kretzing Decl. Ex. E at 5.)  The Grievance Coordinator also provided "Specific facts and reasons supporting [the] decision."  (*Id.*)  Notwithstanding that one of those reasons is that the grievance is vague, this writing constituted a "decision" by the Grievance Coordinator, which under the rules of the NCCC, entitled Plaintiff to appeal to the Chief Administrative Officer.  Plaintiff expressed his desire to appeal the decision, checking off the appropriate box which states, "I have read and appeal the Grievance Coordinator's decision."  (*Id.*)  Unlike a returned grievance which the inmate would need to resubmit with greater detail or support, an appeal requires the NCCC to present the grievance to the Chief Administrative Officer for review.

It is clear that Plaintiff attempted to appeal the Grievance Coordinator's decision and was unable to do so.  Therefore, exhaustion requirements may be excused here because administrative remedies were unavailable to Plaintiff, and Defendants' own actions inhibited exhaustion.  *See, e.g., Hosannah v. Nassau Cty. Criminal Supreme Court Sergeant Officer(s)*, 16-CV-1045 (JFB) (AYS), 2017 WL 3207966, at *4 (E.D.N.Y. July 5, 2017), *R&R adopted sub nom Hosannah v. Sposato*, 2017 WL 3207750 (E.D.N.Y. July 26, 2017) ("Even where a plaintiff does not formally exhaust his administrative

remedies, exhaustion may be excused if: (1) administrative remedies were not actually available to the prisoner; (2) defendants' own actions inhibited exhaustion, constituting a waiver of the defense; or (3) 'special circumstances' justify non-exhaustion."). Defendants failed to adequately explain why Plaintiff's appeal was not addressed. The record as to this matter is unclear and any ambiguity must be interpreted in favor of Plaintiff. *See Anderson*, 477 U.S. at 255; *Pinto*, 221 F.3d at 398.

Accordingly, the undersigned will address the merits of Plaintiff's claims.

C.    Plaintiff's § 1983 Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that the conduct at stake was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citation omitted).

Here, Defendants do not contest that the alleged conduct was committed under color of law. The only challenge is to the second element: whether Defendants' conduct deprived Plaintiff of his constitutional rights. *See, e.g., Carbajal v. Cty. of Nassau*, 271 F. Supp. 2d 415, 420 (E.D.N.Y. 2003) (focusing on the second element of a 1983 claim because "the first element is not at issue.")

Plaintiff claims that Defendants impermissibly abridged his First Amendment right to free exercise of religion by denying him daily congregate services during Ramadan and serving him food that had spoiled by the time he completed the fasting period required by his religion. The Court also considers whether the spoiled food constitutes a valid claim under the Eighth Amendment.

1.    First Amendment Right to Free Exercise of Religion

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). However, the constitutional protection afforded to inmates under the First Amendment must be balanced with "the interests of prison officials charged with complex duties

arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The free exercise of religion claims of prisoners are judged using a test of "reasonableness," which is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford,* 352 F.3d at 588 (quoting *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir. 1988)).

Courts faced with constitutional free exercise claims raised by inmates must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid,* 850 F.2d at 926.

The plaintiff bears the burden not only of showing the sincerely held belief and infringement, but, once the defendants have met their "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," the plaintiff must "show that these articulated concerns were irrational." *Cantey v. Martuscello*, 17-CV-0284 (LEK) (CFH), 2019 WL 1397006, at *5 (N.D.N.Y. Mar. 28, 2019) (citing *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)). (quotation marks omitted); *see also Salgado v. NYS Dep't of Corr. & Cmty. Supervision,* 13-CV-1108 (RJA) (MJR), 2016 WL 6311296, at *7 (W.D.N.Y. Sept. 15, 2016), *R&R adopted sub nom*, 2016 WL 6298517 (W.D.N.Y. Oct. 27, 2016); *Salahuddin v. Goord*, 467 F.3d at 275.

### a.   Congregate Services

Plaintiff argues that denial of nightly congregate Ramadan worship violated his First Amendment right to free exercise of religion. (Compl. at 4.) Defendants do not challenge Plaintiff's sincerely held belief or that the inability to have congregate services every night imposed a restriction. They argue solely that "[t]he procedures in place during Ramadan 2014 were borne out of legitimate penological interests." (Defs. Mem. of Law at 8.)

"[I]t is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). However, policies and practices that abridge the plaintiff's free exercise rights "will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'" *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir. 2010) (quotation omitted); *see also Ford*, 352 F.3d at 594. To make this determination, a court may consider four factors: (1) whether there is a "valid and rational connection between the regulation and the legitimate government interest justifying it"; (2) whether the prisoner has "other available means of exercising the right"; (3) "the consequences of requiring accommodation on prison staff, other prisoners and the allocation of prison resources generally"; and (4) "whether available, low-cost alternatives exist that would accommodate the right without compromising valid penological interests." *Ford*, 352 F.3d at 595; *see also Salahuddin v. Goord,* 467 F.3d at 274.

Here, Defendants contend that the decision "to permit only individual and not congregate prayer services was based on the need to ensure the safety, security, good order, and proper staffing of NCCC. . ." (Golio Decl. ¶ 2; Defs. Mem. of Law at 8.) Specifically, they provided an affidavit from Michael Golio, the Commanding Officer of the Sheriff's Department's Legal Unit at the Correctional Center (Golio Decl. ¶ 1), explaining that, because the NCCC does not have a central cafeteria or mess hall, "security staff not otherwise available has to be identified and redeployed from other duties/assignments, or additional off-duty staff has to be hired on an overtime basis" if daily congregate services were to be provided. (*Id.* ¶ 6.) Because the NCCC operates three separate buildings, these requirements for a 30-day period are significant and "above the ordinary mandates of the facility." (*Id.* ¶ 6.) He adds that Ramadan took place that year during summer, when heightened leave usage by staff creates a "further strain on facility resources." (*Id.*) Defendants also provided copies of documents related to the investigation of Plaintiff's grievance, which explain the

13

process by which the policies applied during Ramadan in 2014 were adopted, including their consultation with Imam Kareem and consideration of alternative accommodations. (Kretzing Decl., Ex. D, Dkt. 59-5.) Thus, Defendants have provided a rational connection between a legitimate government interest in security and the restriction on congregate worship during Ramadan in 2014, as well as the effect permitting such congregate worship would have on prison resources.

Plaintiff challenges these assertions as conclusory and lacking in detail, but he does not provide evidence to controvert them. (*See, e.g.,* Pl. Sur-Reply ¶ 13.) "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Plaintiff also argues that Defendants should not have relied on Imam Kareem's opinion that daily congregate celebration was not required for celebrating Ramadan. (Pl. Supplemental Affidavit ¶¶ 21-25.) Even taking into consideration Plaintiff's sincerely held belief that congregate worship is central to his practice as a Muslim, Plaintiff fails to show that Defendant's security and budgetary constraints are irrational. *See Ford,* 352 F.3d at 594-95. Requiring staff to be present where inmates congregate, even for religious purposes, is reasonable, and balancing the extra resources needed to add or change shifts for this purpose every night for a month is within the purview of legitimate administrative choices. *See, e.g., Benjamin,* 905 F.2d at 574 ("[r]ecognizing that federal courts are ill-equipped to deal with the complexities of prison administration, the Supreme Court has accorded great deference to determinations of prison officials. . ."); *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"); *Henry v. Schriro*, 10-CV-7573, 2011 WL 3370394, at *2 (S.D.N.Y. Aug. 2, 2011) ("[E]fficiently allocating a limited operating budget by minimizing unnecessary administrative costs is a legitimate penological goal.").

Moreover, Plaintiff was not deprived of all forms of religious exercise during Ramadan. Not only were inmates allowed to fast, but they could also pray and celebrate the nightly break fast on an individual basis in their own cells, participate in weekly Friday congregate services, and gather for a congregate service for Eid al Fitr to celebrate the end of Ramadan. (Defs. Statement ¶¶ 11-12; *see also* Golio Decl. ¶¶ 2, 8; Kretzing Decl., Ex. D.) While the existence of other forms of religious observances does not diminish the spiritual experience of daily congregate worship, *see, e.g., Makin v. Colorado Dep't of Corr.*, 183 F.3d 1205, 1211 (10th Cir. 1999), it does highlight that the restriction imposed here was narrow and reasonable. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) ("the record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. . . .this ability [] to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.")

Accordingly, the undersigned recommends that Defendants' Motion be granted as to Plaintiff's § 1983 free exercise of religion claim with regard to daily congregate services.

b. <u>Food</u>

Plaintiff alleges that Defendants failed to provide him with adequate food during Ramadan, in violation of his First Amendment right to free exercise of religion. According to Plaintiff, meals (which were distributed around 4:00 or 4:30 p.m.) would sit in Plaintiff's cells for several hours until he could "actually pray and then consume the meal…," by which time it had often become spoiled. (Pl. Supplemental Affidavit ¶ 40.)

Plaintiff does not contest that the <u>type</u> of food provided to Muslim inmates was adequate, or that it was edible at the time it was served. However, Plaintiff has provided evidence in the form of his sworn testimony that, by the time Plaintiff ended his Ramadan fasting and was able to eat, that food had spoiled.

15

A substantial burden[6] on a person's free exercise of religion exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quotations and quotation marks omitted). "Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life, including, pertinently, that of an inmate's diet and participation in religious meals." *DeJesus v. Bradt*, 174 F. Supp. 3d 777, 785 (W.D.N.Y. 2016). Courts have "generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004).

Defendants deny that the food had spoiled between the time it was served and the time fasting inmates could eat it. However, in considering a motion for summary judgment, the facts must be construed in favor of the non-moving party, and Plaintiff has presented enough to create a genuine dispute of material fact.

Defendants also contend that "even if there were occasions where the food did spoil," it was only a *de minimis* burden on Plaintiff's free exercise rights. (Defs. Mem. of Law at 11.) Although there "may be inconveniences so trivial that they are most properly ignored, *McEachin*, 357 F.3d at 203, the cases Defendants cite involve the denial of Ramadan meals for a short period of time: two breakfasts and one evening meal, *Washington v. Affy*, 968 F. Supp. 2d 532, 537-38 (W.D.N.Y. 2013); two meals, *Jean-Laurent v. Los*, 12-CV-132 (SF), 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 9, 2015); meals on seven occasions over several days, *Odom v. Dixion*, 04-cv-889F, 2008 WL 466255, at *10-12 (W.D.N.Y. Feb 15, 2008); three or four meals, *Thomas v. Picio*, 04-cv-3174, 2008 WL 820740, at *6

---

[6] The Second Circuit "has not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs. *Salgado*, 2016 WL 6311296, at *7 (citing *Williams v. Does*, 639 Fed. Appx. 55 (2d Cir. 2016); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014)). Here, the undersigned applies the substantial burden standard and finds that it has been met.

n.8 (S.D.N.Y. Mar 26, 2008); and proper meals for periods covering transfers between facilities, *Lewis v. Zon,* 920 F. Supp. 2d 379, 385-86.

Here, Plaintiff alleges that he was denied proper food "most nights" during a 30-day period because the food was served in a manner that caused it to spoil by the time he could eat it. (Compl. at 4.) This is not trivial. If true, a reasonable jury could conclude that this was an impermissible infringement on Plaintiff's exercise of religion during Ramadan by forcing him to choose between eating food before it spoiled – in contravention of the religious requirement of fasting until sundown – and going hungry or getting sick during a 30-day period. *See Williams*, 639 Fed. Appx. At 55.

Accordingly, the undersigned finds that there is a genuine dispute as to a material fact and recommends that Defendants' Motion be denied as to Plaintiff's §1983 claim for denial of adequate food in violation of the First Amendment.

2. Eighth Amendment

Although the claims in the Complaint are based on the First Amendment (Compl. at 4), and Defendants' arguments in the Motion and supporting documents mostly revolve around that right (Defs. Mem. of Law at 11-12), Plaintiff in his Memorandum of Law seems to argue for the first time that the spoiled food allegations also constitute a violation of his Eighth Amendment rights.[7] (Pl. Mem. of Law ¶ 10.) Therefore, that constitutional right will be considered as well.

The Eighth Amendment requires that inmates be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.

---

[7] Defendants' Reply vaguely addresses Plaintiff's Eighth Amendment allegations. (*See* Dkt. 74.)

1983).  "Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment."  *Rasheen v. Adner*, 356 F. Supp. 3d 222, 241 (N.D.N.Y. 2019).

Even assuming that the meals provided to Plaintiff during Ramadan were spoiled by the time he finished fasting, Plaintiff testified during his deposition that he "did not 'become sick' from eating the food," but "became hungry, drank water to 'quell' his hunger and suffered weight loss, going from 220 pounds to 160 pounds."  (Pl. Supplemental Affidavit ¶ 46)  He did not describe any injury or health consequence beyond losing weight.  (Pl. Deposition at 40.)  *See, e.g., Rasheen* 356 F. Supp. 3d at 241 (dismissing plaintiff's Eighth Amendment claims for failure to allege "that he actually suffered any injury as a result of ingesting contaminated food"); *Stokes v. Goord*, 03-CV-1402 (LEK) (DRH), 2007 WL 995624, at *4 (N.D.N.Y. Mar. 30, 2007) (dismissing plaintiff's Eighth Amendment claim because records did not indicate that the plaintiff suffered any adverse health effects from the food served to him).  Plaintiff has presented no evidence that losing weight from 220 to 160 pounds constituted an "adverse health effect."  *Stokes,* 2007 WL 995624, at *4.  In the absence of actual physical injury resulting from the food deprivation or contamination, Plaintiff cannot sustain an Eighth Amendment claim.

Thus, construing the Complaint as asserting an Eighth Amendment claim for spoiled food, the undersigned recommends that Defendants' Motion be granted as to such claim.

## CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that the Motion for Summary Judgment be granted as to all claims against the Nassau County Sheriff's Department and as to Plaintiff's First Amendment claim related to denial of nightly congregate services and Eight Amendment claim related to spoiled food.  The undersigned recommends that the Motion be denied as to Plaintiff's First Amendment claim based on food provided during Ramadan.

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by certified mail.

Any objection to this Report and Recommendation must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any such objection waives the right to further judicial review of this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

United States Magistrate Judge

Dated:    Brooklyn, New York
          August 29, 2019